## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

```
JOHN D. HORTON,                    )
                                   )
                Plaintiff,         )
                                   )
v.                                 )        No.   06-1219-MLB
                                   )
MICHAEL BRISTOL, et al.,           )
                                   )
                Defendants         )
_____)
```

### MEMORANDUM AND ORDER

#### Background

On July 28, 2006 plaintiff filed this action pursuant to 42 U.S.C. § 1983. He also alleged a number of pendent state claims. The case arises out of an incident which occurred on May 8, 2006 in and around the small community of Osborne, Kansas. Plaintiff's complaint alleged the following "facts":

> The plaintiff is an Hispanic, minority male and at any and all times relevant hereto, was employed as a Librarian at Larned State Hospital, Larned, Kansas. The plaintiff has a Master's Degree in Library Science from the University of Oklahoma (1985). On May 8, 2006, the plaintiff was assigned to attend a library conference sponsored by the Central Kansas Library System at the public library in the hamlet of Osborne, Kansas. Those in attendance were all library employees from various libraries associated with Central Kansas Library System. At approximately 10:00 a.m. Michael Bristol, defendant herein, came barging into the meeting room of the Osborne Public Library demanding to know where the colored person was who had just parked his official Kansas state vehicle in front of the library. Chief Bristol related how the "Name Unknown Vigilante ...", defendant herein, had spotted a colored person, plaintiff herein, 20 miles outside of the city limits of Osborne, had stalked and followed the plaintiff for nearly half an hour to determine where the plaintiff was going, and upon finding that the plaintiff had entered the Osborne Public Library immediately reported to Bristol that the nigger was raping the white women in the library and that the nigger had to be lynched. Bristol did thereupon begin the lynching of the plaintiff by illegally and wrongfully

arresting him and transporting the plaintiff to the Osborne Police Department. During the course of the next hour the plaintiff was falsely imprisoned and forced to listen to Bristol and the Vigilantee mock, insult, ridicule, degrade, harass and intimidate the plaintiff on the basis that Bristol and the Vigilantee did not want any niggers in their town. Bristol wrongfully, unlawfully and without probable cause obtained the plaintiffs driver license and the plaintiffs Kansas state government business card and made a photocopy of them. As a cover-up for their criminal acts, Bristol and the Vigilantee fabricated an allegation that the plaintiff had committed a driving infraction 20 miles outside of the Town of Osborne's. The plaintiff was ordered out of town by sundown.

The following day the plaintiff swore out criminal complaints against Bristol and the Vigilantee which were mailed to Osborne County Sheriff Miner and Kansas Attorney General Phill Kline, defendants herein. Sheriff Miner never responded and Attorney General Kline's office responded that the lynching of niggers is a private matter, is outside of the jurisdiction of the Attorney General's office as a criminal complaint and that the plaintiff should seek the assistance of a private attorney.

Upon being notified that criminal complaints had been sworn out against them, Bristol conspired with the Vigilante to retaliate against the nigger Horton. Bristol wrongfully and unlawfully provided information regarding the plaintiffs employment to the Vigilante. The Vigilante then conspired with his mother to write a vitriolic anti-nigger hate letter complaining about the State of Kansas sending niggers up to white Osborne County. This anti-nigger hate letter was mailed to the plaintiff's second level supervisor, Mark Schutter, defendant herein, who became enraged that the nigger Horton had caused such a fuss up in Osborne by not accepting his lynching like a good little nigger. Schutter replied to the Vigilantee's mother that the matter would be taken care of and the nigger Horton was promptly fired without cause and without notice of June 15, 2006.

(Doc. 1 at 4-6). Plaintiff prayed for actual and punitive damages and

injunctive relief (Doc. 1).

Named as defendants were Michael Bristol, Chief of Police of

Osborne; Mark Schutter, Superintendent of the Larned State Mental

-2-

Hospital; Curt Miner, Osborne County Sheriff and Phill Kline, then Kansas attorney general.   All were sued only in their individual capacities.   Also named as defendants were "name unknown vigilante, 27 year old white mile, dishwasher at a restaurant, crackhead and personal friend of Michael Bristol" and "mother of the name unknown vigilante, white female." Plaintiff was granted leave to proceed *in forma pauperis* and, in due time, all defendants were served except "the unknown vigilante," and his "mother."  (Docs. 7-12).

Defendant Bristol filed an answer (Doc. 16) and defendants Kline, Schutter and Miner filed motions to dismiss (Docs. 18, 22 and 23).  Defendant Bristol also moved for summary judgment (Doc. 28) and filed a motion for sanctions (Doc. 35).  Defendant Kline then filed an answer and motion for summary judgment (Docs. 43 and 44).

On November 16, 2006, without requesting leave to do so, plaintiff filed an amended complaint, the effect of which was to identify Andy Snook and Judith Snook as the individuals previously identified as "vigilante, 27 year old white male, dishwasher at a restaurant, crackhead and personal friend of Michael Bristol" and "mother of the name unknown vigilante, white female" (Doc. 50). Otherwise, the substance of the amended complaint was identical to the original complaint.  Defendants Snook were served (Doc. 69).  In due course, the other defendants filed answers and/or dispositive motions directed to the amended complaint (Docs. 51, 52, 55, 57 and 60). Defendants Snook filed an answer (Doc. 79) but no dispositive motion.

In addition to the motions filed by the various defendants, plaintiff filed a cross-motion for sanctions (Doc. 63) and what he styled a cross-motion for summary judgment (Doc. 67), both against

-3-

Bristol.[1]  Other submissions were filed by the parties which will be mentioned as necessary.

<u>Undisputed Facts</u>[2]

On, May 8, 2006, plaintiff was to attend a conference in the Osborne, Kansas, City Library.   South of Osborne, plaintiff encountered a construction zone.   Plaintiff was in a line of cars following a pilot car through the construction zone.

On May 8, Osborne Chief of Police Mike Bristol was contacted by the county dispatcher to come to the sheriff's office to take a driving complaint.   Bristol responded to the sheriff's office and met a citizen named Andrew Snook.   Snook told Bristol that he had been driving in the construction zone south of town in a line of cars following a pilot car, when he was passed by a car with official Kansas state plate #01481.   Snook advised Bristol that he thought the driver of the state car's actions were reckless and endangered the lives of Snook, his young daughter in the car with him and others on the road. Snook advised Bristol that he had followed the state car to the Osborne City Library where the driver exited the car and entered the library.   Snook made no mention of or reference to the race of the driver.

Since the complaint involved actions outside the city limits, Bristol told Snook to make contact with sheriff's deputies and that

---

[1]Presumably, plaintiff's "claims" against Bristol are those set forth on pp. 9-12 of this Memorandum and Order.

[2]The facts are taken from Bristol's motion for summary judgment, (Doc. 29 at 2-8) which, as discussed herein, have not been controverted by plaintiff.   They are equally applicable to the other motions.

he, Bristol, would go talk to plaintiff at the library.  Bristol went to the library and inquired of the local librarian, Kay Coop, as to who it was that had driven the state vehicle to the meeting. Ms. Coop did not know but pointed to plaintiff as being the most recently arrived meeting attendee.  Bristol did not enter the meeting room but requested Ms. Coop to request plaintiff to come outside of the library to talk to Bristol.  Bristol did not enter, interrupt or disrupt the meeting. He made no mention of plaintiff's race, no mention of "colored persons" or niggers or anyone being raped.

Plaintiff came outside the meeting and spoke with Bristol who advised plaintiff that a citizen had made a complaint about the driver of the state car and asked plaintiff if he was the driver of that car. Plaintiff responded that he was and that he had driven through the construction zone south of Osborne.  Plaintiff stated to Bristol that he did not realize that he was in a construction zone or following a pilot car.  Plaintiff also opined that the construction zone was not properly signed.  Bristol asked plaintiff if he would go one block to the sheriff's office and meet with Snook and let him hear his side of the story. Plaintiff agreed and walked over to the sheriff's office. Bristol drove his car to the sheriff's office.

Bristol requested the dispatcher to send a sheriff's deputy to handle the complaint as the events occurred outside of the city limits.  The deputy responded that Bristol should handle the matter and take the report.  Bristol, plaintiff and Snook stood outside in the driveway and discussed Snook's complaint.  Plaintiff explained what had happened and why. Snook expressed his concern for his daughter who was with him in the car.  Bristol then asked what Snook

-5-

wanted to do with his complaint. Snook responded that he wanted nothing but that an apology was in order.  Plaintiff stated that he apologized but he did not realize that a pilot car was leading vehicles through a construction zone because he did not see any signs. Bristol then asked plaintiff for his driver's license to include in his report in order to have all of the information available when he turned the report over to the sheriff's deputies.  Plaintiff stated that his license was in his a car a block away at the library. Plaintiff walked to his car, retrieved his license and returned with a Washington state driver's license.  Plaintiff was not accompanied by Bristol or anyone else during his trip to his car to retrieve his license.  Plaintiff also provided a copy of his business card to Bristol and told Bristol to keep it in case he needed to contact plaintiff about the complaint or any court proceedings arising out of the complaint.

Bristol told plaintiff that Snook merely requested an apology and since that had been given, Bristol did not think any court proceedings would result.  Bristol went inside the sheriff's office to make a copy of the license and card for the report. Plaintiff then came into the office and stated that Snook had threatened to hit him. Bristol asked plaintiff if he wanted to press charges and, if so, stated that he needed to prepare a written statement about the threat. Bristol and plaintiff returned to the driveway where Bristol asked Snook what had happened.  Snook denied threatening to hit plaintiff. Bristol then asked the two men what they wanted to do.  Plaintiff stated that if Snook would not report the driving incident, plaintiff would not pursue the threat charge.  Snook stated all he had wanted

was an apology and for plaintiff to drive more carefully, especially in construction zones.

Plaintiff, who appeared to Bristol to be Caucasian, did not mention his race in any conversation with Bristol. Bristol made no derogatory or racial remarks to or about plaintiff, nor did he make any inquiries or statements to anyone referring to plaintiff as "colored" or as a "nigger." Bristol did not arrest or transport plaintiff at any time, nor did he imprison plaintiff or force him to go or stay anywhere. Bristol did not mock, ridicule, insult, degrade, harass or intimidate plaintiff.

On June 5, 2006, plaintiff wrote a letter to the Attorney General about the incident. The letter contains no mention of plaintiff's race and does not indicate that anyone objected to plaintiff's presence in Osborne because of his race or otherwise. The letter does not claim that Snook's complaint was motivated by race but states affirmatively that Snook was "[o]bjecting to my having attempted to pass him and the semi-tractor trailer" while in the construction zone. The letter makes no mention of Bristol having made racial comments or arrested or imprisoned plaintiff; it only states an objection to Bristol, a city officer, investigating a complaint about driving outside of the city limits. The Attorney General's letter responding to plaintiff's criminal complaint does not state that "nigger lynching is a private matter," as alleged in plaintiff's complaint.

Snook's mother wrote a letter to Schutter expressing a complaint about plaintiff's driving conduct. The letter makes no mention of plaintiff's race and specifically does not refer to him as a "nigger,"

-7-

nor is it an "anti-nigger hate letter" as alleged in plaintiff's complaint.

Thereafter, plaintiff was fired from his employment.

Plaintiff filed no notice of claim with the city clerk.

<u>Plaintiff's Responses to Defendants' Motions</u>[3]

On November 27, 2006, this court entered an order pertaining to the handling of defendants' dispositive motions then on file. The court directed plaintiff to file separate responses to each motion and admonished plaintiff that the ". . . responses shall comply with all applicable federal rules of civil procedure and rules of this court. Plaintiff's pro se status does not excuse him from complying with applicable rules of procedure. On the contrary, pro se parties must follow the same rules of procedure that govern other litigants. <u>United States v. Ceballos-Martinez</u>, 387 F.3d 1140 (10th Cir. 2004). A failure by plaintiff to follow applicable rules and orders of this court will result in the imposition of sanctions which may include dismissal of this case, with prejudice." (Doc. 59 at 2).

Despite this specific admonition, plaintiff's responses to defendants' dispositive motions did not comply with applicable rules, notwithstanding plaintiff's evident familiarity with the rules. <u>See</u>, <u>e.g.</u>, Doc. 67 at 35. In particular, plaintiff responded to the motions for summary judgment filed by Bristol and Kline, and the motions to dismiss filed by Schutter and Miner, with the following

---

[3]Plaintiff's response to each motion is basically identical. The facts are those set forth herein. Each response includes a long discourse on various legal topics, which appears to have been taken, in whole or in part, but without attribution, from a treatise of some kind.

"facts:"

1. Plaintiff was a librarian for the Larned State Hospital, Larned KS.

2. On May 8, 2006, the plaintiff was traveling north from Larned KS to Osborne KS to attend a meeting of the Central Kansas Library System which was being held at Osborne KS.

3. South of the City of Osborne, in the County of Osborne, and outside of the law enforcement jurisdiction of defendant Bristol, plaintiff encountered a construction zone being operated by the Kansas Department of Transportation. Due to the fact that the Kansas Department of Transportation appears to hire illegal aliens who cannot read, write or understand English, signs indicating the length of the construction zone, signs indicating that a pilot car was in use and signs indicating that only one lane of traffic was in use, were missing.

4. Plaintiff was the third vehicle which the plaintiff observed in a line of car with Andy Snook immediately in front of the plaintiff and a semi-tractor trailer in the lead. The plaintiff did not have visual contact with the pilot car and there never was posted a sign indicating that there was a pilot car.

5. Andy Snook went to his personal friend and acquaintance, defendant Bristol and asked his assistance in lynching a nigger whom Snook had observed riding into the dusty, one-horse town of Bristol, Kansas. Bristol was never contacted by the Sheriff because Snook never went to the Sheriff. Bristol's assertion that the Sheriff was involved is nothing more than self-serving hearsay which must be stricken as testimony.

6. Bristol did more than meet Andrew Snook. Snook was a long time friend and acquaintance of Bristol who Bristol had arrested numerous times for being a crackhead and wife beater. Bristol's interest in the case was more out of respect for Snook's father, a retired Kansas Highway Patrol officer, than any interest in the irrational rantings of a lunatic crackhead like Andrew Snook.

7. Snook advised Bristol that a nigger had come into town and that the local Ku Klux Klan and Vigilance Committee needed to be called up to deal with the nigger problem. Snook never advised Bristol that there were no signs indicating that a pilot car was in use. Snook never advised Bristol that there were no signs indicating the length of the construction zone. Snook never advised

Bristol that there were no signs indicating that only one lane of traffic was in use and that there was a no-passing zone for over 20 miles passed the area of actual construction on the highway by the illegal aliens employed by the Kansas Department of Transportation.

8. Snook, as a convicted felon and crackhead, had nothing better to do on a weekday morning than go joy-riding with his daughter being subjected to his intoxicated behavior.

9. Snook, advised Bristol that he had stalked the nigger and so that he was holed up in the Osborne Public Library.

10. Snook, wildly denounced the nigger and proclaimed white-power throughout Osborne in the name of Timothy McVeigh and all other secessionist and white militia movements.

11. Snook wanted the nigger lynched and killed proclaiming that no nigger has a right to ride around in a state government vehicle as long as Snook is a convicted felon and crackhead.

12. Neither Snook nor Bristol ever made contact with the Osborne County Sheriff because this was not about law enforcement but about lynching a nigger who had entered white-mans territory.

13. Bristol, without any authorization of law, rule or regulation, unlawfully and wrongful broke into and disrupted a meeting of the Central Kansas Library System being held at the Osborne Public Library for the purpose of lynching the nigger Horton.

14. Bristol, most definitely entered the Osborne Public Library and disrupted the meeting of the Central Kansas Library System which consisted of approximately 20 library personnel from various libraries in the central part of Kansas.

15. As Bristol had no lawful authority to be in the library, his presence was in and of itself disruptive of the librarians meeting.

16. The plaintiff was forced outside by the gun toting nigger hater Bristol.

17. Bristol wanted to know what the hell a nigger was doing up in the white man library with all the white women inside.

18. The plaintiff attempted to figure out who this stupid

goober was who kept babbling about a nigger having been spotted coming into town and wanting to know why he was hanging around the white man's library.

19. Bristol forced the nigger Horton back to the city police station not back to the Sheriff's Office.

20. Plaintiff never agreed to talk to Snook but was forced by Bristol to be subjected to an anti-nigger rant by Snook.

21. Bristol drove his car back to the city police station.

22. Bristol never contacted the sheriff's office and in any event, there is no law, rule or regulation which authorizes the sheriff to delegate his authority to local law enforcement in non-emergency situations.

23. Bristol was never authorized by the sheriff to do anything.

24. Bristol forced the plaintiff to endure verbal abuse and an assault by Snook against the plaintiff.

25. Bristol allowed Snook to thoroughly degrade, humiliate, embarrass, shame and frighten the nigger Horton.

26. Snook was allowed by Bristol to mock, ridicule and insult the nigger Horton.

27. The plaintiff never apologized for anything because the nigger Horton had never done anything wrong. If Snook was really concerned about highway safety, he would have complained to the Kansas Department of Transportation and told them to install the appropriate road signs indicating the length of the construction zone, that a pilot car was in use and that only one lane of traffic was in use.

28. Bristol wrongfully and illegal acquired a copy of the plaintiff's driver's license.

29. Bristol was not authorized to investigate the case under any law, rule or regulation.

30. Bristol forced the plaintiff to turn over his driver's license.

31. Bristol forced the plaintiff to turn over his driver's license.

32. Bristol was always watching the plaintiff as he walked to his car.

33. Bristol illegally took a copy of the plaintiff's state government business card. Eventually, both the driver's license and the business card were provided to Snook and his mother.

34. Bristol was not authorized to provide any information about the plaintiff to Snook so that he could engage in any further anti-nigger rampaging.

35. Bristol went into the city police department to make a copy of the plaintiff's driver's license and business card.

36. Snook then assaulted the plaintiff and Bristol did nothing about it.

37-61. At the next meeting of the Ku Klux Klan it was decided that the nigger Horton would be further harassed by having Snook's mother write an anti-nigger hate letter to the nigger's employer in an attempt to get him fired.

(Doc. 67 at 1-7).

Not one of these "facts" is supported as required by Fed. R. Civ. P. 12(c) and Rule 56(c) and (e), thereby leaving undisputed the facts relied upon by defendants. Even if plaintiff had accompanied his "facts" with an affidavit, the law is clear that even when a plaintiff is proceeding pro se, unsupported and conclusory allegations do not create disputed issues of fact. Williams v. Valencia County Sheriff's Office, 33 Fed. Appx. 929 (10th Cir. 2002) (citing Matthiesen v. Banc One Mortgage Corp., 173 F.3d 1242, 1247 (10th Cir. 1999)). Similarly, unsubstantiated allegations carry no probative weight in summary judgment proceedings. To defeat summary judgment, evidence must be based on more than mere speculation, conjecture or surmise. Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004). Of course, it is readily apparent that the "facts" set forth by plaintiff do not rise even to these levels of insufficiency. Most

of the "facts" are subject to being stricken pursuant to Fed. R. Civ. P. 12(f).  A lawyer who would place such "facts" in a pleading would be subject to discipline, not merely sanctions under Rule 11.  The "facts" serve but one legitimate purpose: to demonstrate why defendants' dispositive motions must be sustained.

<u>Bristol's Motion for Summary Judgment</u>

Bristol moves for summary judgment on two grounds: (1) the undisputed facts show that he did not violate plaintiff's rights under the Fourth and Fourteenth Amendments and (2) because the claims against him are in his individual capacity only, he is entitled to qualified immunity.  The court finds it unnecessary to reach the matter of Bristol's qualified immunity because, under the undisputed facts, plaintiff's contact with Bristol was a consensual encounter which did not implicate, much less violate, plaintiff's rights under the Fourth and Fourteenth Amendments.  Plaintiff was not detained or arrested or restrained in any manner.  <u>See</u> <u>United States v. Ringold</u>, 335 F.3d 1168, 1173 (10th Cir. 2003) and <u>Cortez v. McCauley</u>, 438 F.3d 980, 989 (10th Cir. 2006).  Therefore, Bristol is entitled to summary judgment on plaintiff's federal claims.  The court declines to exercise jurisdiction over the pendent state law claims, 28 U.S.C. § 1367(c)(3), which makes it unnecessary to rule on Bristol's defense that the court lacks subject matter jurisdiction over plaintiff's state law claims.

Accordingly, Bristol's motion for summary judgment (Docs. 28 and 29) is sustained.

<u>Kline's Motion for Summary Judgment</u>

Following the incident in Osborne, Horton wrote a letter dated

-13-

June 5, 2006 to former attorney general Kline, Bristol and Sheriff
Miner.  The contents of the letter are as follows:

> Dear Police Chief of Osborne, Osborne County Sheriff and
> Kansas Attorney General:
>
> One of the Osborne City Police officer's was
> investigating a citizen complaint regarding my driving[1]
> south of the City of Osborne in the County of Osborne,
> This officer came into a meeting being held at the
> Osborne Public Library.  Obviously, there is a problem
> with the jurisdiction of a city police officer
> investigating a complaint that originated outside of the
> city limits of Osborne.  The city police officer acted
> without jurisdiction in requesting a copy of my driver's
> license and other personal information including my state
> business card.  In addition to wrongfully requesting this
> information, he wrongfully distributed it to the
> complaining individual.  I would like to file a complaint
> of official police misconduct against this officer for
> wrongfully requesting identification information from me
> when he did not have jurisdiction to investigate the
> matter and also for wrongfully distributing it to the
> complaining individual.
>
> I am interested in obtaining a copy of any police or
> court records that pertain to the complaining
> individual.[2] Please advise regarding the proper procedure
> to obtain this information. Your police officer said that
> the complaining individual had been arrested before so
> there should be an arrest report and perhaps some court
> records.  During my conversation with the complaining
> individual, he gave every appearance of being a crack
> head, glue sniffer and a belligerent drunk.  During the
> course of my conversation with the individual, he
> threatened to hit me.  The city police officer refused to
> arrest the individual on assault charges because they and
> their families are personally acquainted with one
> another.
>
> Thank you.
>
> > [1]There was a construction zone on U S Highway 281 but
> > it lacked signage indicating the length of the
> > construction zone or that a pilot car was being used
> > to guide traffic.  After several miles of traveling
> > behind a semi-tractor trailer and not seeing any
> > orange cones or other markings or signs indicating
> > that the road was under construction, I attempted to
> > pass a semi-tractor trailer and a pickup truck.  As
> > I was behind a semi-tractor trailer, I never saw the
> > pilot car until I attempted to pass the semi-tractor

trailer.  The complaining individual is objecting to
my having attempted to pass him and the semi-tractor
trailer.

[2]I think his name is Skooter.  His father is a
retired Kansas Highway Patrol trooper.

(Doc. 19-2).

C.W. Klebe, special assistant attorney general, responded in a

letter dated June 9, 2006, as follows:

Mr. Horton,

Thank you for addressing this office with your concerns.

At this time, however, I must inform you that this office
is unable to render legal advice to citizens other than
to tell them that they should seek outside counsel and
discuss which if any courses of action to follow.  Should
you desire to pursue this matter further, you should
contact a local attorney and he/she will be able to
advise you further of any available recourse.

(Doc. 19-3).

In the complaint and amended complaint, plaintiff asserted that

"Sheriff Miner never responded and Attorney General Kline's office

responded that the lynching of niggers is a private matter, is outside

of the jurisdiction of the Attorney General's office as a criminal

complaint and that the plaintiff should seek the assistance of a

private attorney."  (Docs 1 at 5-6 and 50 at 5-6.)  Klebe's letter

speaks for itself.  It makes absolutely no reference to "niggers" or

"lynching" and does not state anything that could be construed to be

a violation of plaintiff's constitutional rights.

Former attorney general Kline asserts that he is entitled to

either absolute immunity or qualified immunity, or both.  He also

asserts that plaintiff has no standing to seek injunctive relief

because plaintiff does not claim that he is being prosecuted or that

-15-

Kline has threatened to prosecute or even hinted at doing so.

The court generally agrees with Kline's legal analysis but in terms of practical reality, plaintiff has not even stated a claim against Kline because vicarious liability claims are not actionable under federal civil rights laws. <u>Ledbetter v. City of Topeka</u>, 318 F.3d 1183, 1187 (10th Cir. 2003). Plaintiff does not allege that Kline personally participated in Klebe's response to plaintiff's June 5 letter or, for that matter, that he was even aware of it. Finally, plaintiff's interpretation of Klebe's letter is delusional, pure and simple. 28 U.S.C. § 1915(e)(2)(B)(ii). For the same reason, the claim is frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

Accordingly, Kline's motion for summary judgment is sustained.

<u>Schutter's Converted Motion for Summary Judgment</u>[4]

Mark Schutter is the Superintendent of the Larned State Mental Hospital. Judith Snook's May 23, 2006 letter to Schutter reads as follows:

Dear Administrator,

Please allow me this opportunity to vent my frustration with one of your employees. On May 8, 2006 at approximately 9:00 am my son and his daughter were traveling on Highway 281 south of Osborne. As they were heading north in a highway work zone following a pilot car, a vehicle came up from behind them and began to pass my son's vehicle and a couple more vehicles while they were all behind the pilot car. As the driver of the passing vehicle was in the midst of passing everyone they crested a small hill and there sat a work truck. Luckily the truck was off the shoulder but it could have very well been setting in the work lane of the highway. Then imagine what the results would have been if the passing vehicle would have hit the truck and possibly other vehicles. Had this been the end of the story it would have been bad enough. But, oh no, there is more!

_____

[4]By order dated February 7, 2006 (Doc. 94), the court notified the parties that it would treat Schutter's motion to dismiss as a motion for summary judgment and gave the parties until February 14 to file appropriate responses. None have been filed.

My son, Andy, managed to get a description and tag number
of the vehicle (01481 a Kansas Official Tag). Andy then
followed this vehicle to Osborne to see where he was
going. The vehicle was located parked in front of our
local Public Library. Needless to say, my son was upset
with what had just happened and what could have happened.
Instead of taking matters into his own hands and
confronting the driver Andy went to the local law
enforcement and described what had just occurred. Police
Chief Mike Bristol contacted the driver of the vehicle,
a Mr. John Horton and brought him together with Andy and
Chief Bristol. At this time Mr. Horton very indignant,
said that he didn't realize he was in a work zone (that
was very clearly marked). And then began to insult my
son saying that Mr. Horton's meeting was more important
than my granddaughter. Also that Andy was some kind of
Cop wannabe. And according to Chief Bristol, Mr. Horton
was even demeaning to him.

My husband worked for the State of Kansas for over 28
years dealing with the public every day, and yes, we know
that there are good as well as bad people out there.
However, how embarrassing for your department and our
state to have an employee representing you behave in such
an outlandish manner. If we, as a family, had just
looked the other way and forgotten all about this, then
I feel that we would have been guilty of allowing these
types of things to go on without making an effort to
prevent something horrible from happening in the future.

(Doc. 58-2).

Schutter did not respond to Snook. However, by letter dated

June 15, 2006, Schutter notified plaintiff that he was being dismissed

as a probationary librarian and at the hospital:

Dear John:

The purpose of this letter is to notify you that you are
being dismissed from employment as a probationary
Librarian I at Larned State Hospital effective today,
June 15, 2006, your last official day on the payroll.
The reason for your dismissal is as follows:

Before a final decision is made on the dismissal, you
have the opportunity to appear before me, to respond in
writing, or to take both actions, to present your reasons
or explanations as to why your dismissal should not take
place. This opportunity for you to appear shall be at
the Superintendent's Office Tuesday, June 20, 2006, at
2:30 P M. You have the right to representation during

-17-

the opportunity to appear and may bring an attorney or other representative of your choice. Should you choose to respond in writing, I must receive your written response no later than 12:00 noon on Tuesday, June 20, 2006. You will be notified as to my decision on the issue of the proposed dismissal on or before Friday, June 23, 2006.

Please notify my office by 5:00 P M Monday, June 19, 2006, whether or not you plan to come in to talk with me.

(Doc. 58-3).

Schutter wrote another letter to plaintiff dated June 29, 2006:

Dear John:

In accordance with my letter of June 15 2006, which notified you of termination from your employment with Larned State Hospital, you were afforded the opportunity to reply or appear as to why this action should not take place. I appreciate your meeting with me. This is to inform you that I am placing you on administrative leave from June 15, 2006 through June 30 2006. Your termination from Larned State Hospital is effective July 1, 2006.

During the meeting you presented a drafted letter of recommendation for future employers. While I am not comfortable signing this letter, I will be glad to provide information to any potential employer upon receipt of a signed release for information. My recommendation will include your numerous strengths of organization and library skills but will equally mention your weaknesses in interpersonal relationships.

Please contact the Larned State Hospital Human Resources Office regarding the return of any State property in your possession and the disposition of your final pay check.

(Doc. 58-4).

Plaintiff asserts that Snook's "anti-nigger hate letter was mailed to . . . Schutter . . . who became enraged that the nigger Horton had caused such a fuss up in Osborne by not accepting his lynching like a good little nigger. Schutter replied to [Mrs. Snook] that the matter would be taken care of and that the nigger Plaintiff

was promptly fired without cause and without notice of June 15, 2006." (Doc. 50 at 6.)

Schutter moves for summary judgment on two grounds: (1) Schutter did not violate plaintiff's rights because he did not participate in any of the actions of May 8, 2006 during which plaintiff claims his constitutional rights were violated and (2) Schutter is entitled to qualified immunity. Once again, the court generally agrees with the positions advanced by Schutter but, as with the claims against Kline, the claims are frivolous and fail to state claims upon which relief may be granted. By no stretch of the imagination was Ms. Snook's May 23, 2006 letter "anti-nigger." There is no evidence that Schutter's decision to terminate plaintiff was based on Ms. Snook's letter but, even if it was, there is no evidence that his decision was racially based. The undisputed evidence is that plaintiff was a probationary employee. Plaintiff was given an opportunity to appear before Schutter to explain why he should not be dismissed and plaintiff did so. Plaintiff possessed no constitutional right to continued employment and, even under the most liberal reading of the complaint, no constitutional right was violated by Schutter's decision to terminate plaintiff's employment.

Accordingly, Schutter's converted motion for summary judgment (Doc. 58) is sustained.

<u>Miner's Motion to Dismiss</u>

Plaintiff claims that "[t]he following day the plaintiff swore out criminal complaints against Bristol and the Vigilantee which were mailed to . . . Miner and . . . Kline. Sheriff Miner never responded and . . . Kline's office responded that the lynching of niggers is a

private matter, is outside of the jurisdiction of the Attorney General's office as a criminal complaint and that the plaintiff should seek the assistance of a private attorney." (Doc. 50 at 5-6.) It is assumed that plaintiff is referring to his June 5, 2006 letter (Doc. 19-2).

In his response to Miner's motion, plaintiff asserts:

> Subsequent to the anti-nigger lynching, the plaintiff contacted defendant Miner and attempted to file a criminal complaint [alleging anti-nigger terrorism, kidnapping and lynching] against Bristol and Snook but eventually came to an understanding through defendant Miner's inaction that criminal complaints by niggers against white people are not allowed in Osborne County. Specifically, that Bristol and Snook had entered into a conspiracy with Miner such that Miner would refuse to investigate the lynching of the nigger Horton as a favor to his fellow Klan buddies, Bristol and Snook.

(Doc. 71 at 3).

The most that can be gleaned from all this is that Sheriff Miner failed to respond to plaintiff's June 5, 2006 letter. Even if the bizarre and scurrilous claims in plaintiff's complaint and amended complaint are liberally construed and by some stretch of the imagination are taken as true, there could be no constitutional violation by Miner because plaintiff possessed no constitutional right to have Miner respond to his letter or initiate some sort of investigation into the actions of Chief of Police Bristol. The claim that Miner entered into a conspiracy is frivolous.

Accordingly, Miner's converted motion for summary judgment (Docs. 23 and 61) is sustained.

<u>Conclusion</u>

For the foregoing reasons the dispositive motions of defendants Bristol, Kline, Schutter and Miner (Docs. 22, 23, 28, 52, 60 and 61)

-20-

are sustained, whether directed to plaintiff's complaint, or amended complaint, or both. All other pending motions, with the exception of Bristol's motion for sanctions (Doc. 35) are either denied or are moot. Bristol's motion for sanctions will be ruled upon after the claims against defendants Snook are resolved.

The clerk is directed to enter judgments pursuant to Fed. R. Civ. P. 58. The court finds, pursuant to Rule 54(b), that there is no just reason to delay entry of judgment in favor of defendants Bristol, Kline, Schutter and Miner.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).

IT IS SO ORDERED.

Dated this   21st   day of February, 2007, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE